Case No. 16-1089 at Elm, Rhino Northwest, LLC, Petitioner v. National Labor Relations Board Mr. Garnett for the petitioner, Mr. Laurel for the respondent, Ms. Eglitson for the intervener Good morning. May it please the court. My name is Tim Garnett and I'm here to represent Rhino Northwest. It's a real honor to appear before you this morning. The board's cross application for enforcement of the board's order should be denied and our petition for It also ignored substantial evidence in the record. It was arbitrary because the regional director ignored evidence and in fact the board in its brief mischaracterizes several parts of the evidence. It's also not supported by substantial evidence because the board failed to even recognize evidence that distracted from its decision. In fact, when you look at the regional director's decision, they point to about 39 different facts that were in the record and only eight of those of the employers. So about 83% of the regional director's decision was based on one side. And then when the board wrote its brief in this particular case, they relied on about 104 different pieces of fact and only about 14 or so came from the employer side. So about 88% of the facts. And there was a substantial part of the evidence that was credibility determinations that were never made. In fact, the regional director's hearing officer in this particular case specifically said during the hearing, I am not going to make any credibility determinations. And there were clearly facts that were at opposite ends of the spectrum with each other. The regional director accepted all those determinations. The National Labor Relations Board without any recitation or any kind of discussion of the regional director's decision accepted it as is. But if you examine the facts and you give a fair view of the facts, I think you'll find that the company met its burden of proof of the overwhelming community of interest that's articulated in Blue Man Vegas as well as the specialty healthcare case. And in fact, I really like the Venn diagram that's in Blue Man Vegas because it shows an overlap of eight different factors. And in Blue Man Vegas, it shows that you don't have to have a perfect overlap of all the overwhelming standard. In our particular case, we met seven of those eight factors. And probably the most important fact that the board never addressed and ignored was one of the eight factors set out in Blue Man Vegas. And that is, what is the industry practice? In other words, that's a pretty good measurement of what is standard and what's an appropriate bargaining unit. We had uncontested evidence in this case from the union that has 70 collective bargaining agreements in the Seattle area and in the Northwest. And except in one of those cases, all of them included both riggers and stagehands. Do you know that's not dispositive? I know it's not dispositive, but it's certainly one of the eight factors that they never bothered to consider. And if you... I know it's not dispositive, but if you... It just doesn't prove the point on the part of the inquiry that you carry the burden of proof. No. That there is a contrary practice isn't a winning point. But Blue Man Vegas set out eight different factors that the board should consider. And we met seven of those factors. And they didn't even address that one. They didn't even address the issue of benefits. And the benefits are absolutely identical. And that's, again, one of the factors that this court set out in Blue Man Vegas that the board should be considering. So again, if you look at all of the facts, you will find that this is a type of organization where employees literally work side by side. They all work on a stage probably about half the size of this courtroom. And they all work on one piece of equipment called a truss. A truss is a long piece of metal that holds the lights, speakers, and audio systems on that. And the equipment is brought out by loaders, by stagehands. Then they work side by side with riggers to put lights on this truss, to attach speakers on this truss, or they call it audio boxes, and also video screens that we've seen. I mean, it's absolutely a team effort to get this job done on a stage in a very short period of time. We're talking about four-hour periods to get ready for a concert. Yet the board in its... So even if it's true that one could construct an appropriate bargaining unit that enveloped all of the employees that you're referring to, you have to show that there's no legitimate basis for not constructing it that way, right? True. Well, it's arbitrary or capricious. I mean, there's a number of differences that are utterly inappropriate. There's a lot of different standards that this court, as well as others, have articulated. And if you look at the history of the overwhelming standard, there's not been a single case yet that has found that any employer met that standard. So, is it insurmountable or is it not? Or is it an illusion or is it not? If there's any case where the facts meet that overwhelming standard, it is this one. Because again, if you look at Blue Man Vegas or you look at the criteria in specialty healthcare, we meet those criteria. With one exception, admittedly, the riggers have a higher degree of training and skills. But again, they work side-by-side as stagehands to get these events underway in a very short period of time. And in fact, when the rigger's responsibility is over with, they move over into a stagehand role. During a concert, for example, they'll go up into the heights of the building and operate the lights or do other type of lighting activities. And then when the concert's over with, they reverse and put the equipment away. And all of that doesn't work the other way, right? The other employees can't do the riggers' work. That is true. They cannot because there is a certain level of skill. Except rope access employees also can perform at heights and they also have the exact same type of equipment that they have to work together with. But they can't do the riggers' work. Admittedly, they cannot do the riggers' work. That's absolutely right. And that's not unlike a football team. A football team, I think we would all agree, is a team and it's a team effort to get things done. And everybody in that team has an individual skill. They all work together, but they have independent jobs to do. And in fact, the board... A quarterback would not willingly say, I want to be in a bargaining unit with a tackle. Would not want to? No. He'd say, no, we're... I don't have any larger community of interest. We're a very distinct group. We happen to live in a town where that's a big issue. You're talking about a particular team. I don't think they equate themselves... I mean, there are just so many situations where people are working towards the same end, the crafts, as you know. Electricians are not going to join up with plumbers and they're building the same houses. They have to work with each other because the electrician can't come in until the plumbers or vice versa. I mean, there's so many situations like that. You're right, it's a very tough standard, but the real reason because the law has given great weight to the initial community of interest. And don't we owe deference to the boards? You raise an important issue and that is deference. It's how much deference should be given to the board in this situation. In fact, in your book, you have a nice section about giving deference to agencies and to courts. And I think of it as the rungs of a ladder. And that is the highest level of deference, obviously, is a court to the court. The second level would be a court to an agency that applies the Administrative Procedure Act. And then further down that rung would be an agency that doesn't apply the Administrative Procedures Act. And then you go on down the line where you have an agency that uses administrative law judge, where you use the federal rules of evidence. But in this case, I don't think it deserves the same level of deference that the board claims it deserves because you have a hearing officer who has said on the record he's not going to make any credibility determination. He is not a lawyer and does not follow the rules of evidence and is not making a decision. That decision is then given to somebody else who didn't watch the witnesses, cannot determine credibility. So I don't think deference is appropriate. The same level of deference that you would give to a court or give to even the board where the administrative law judge decides the case is appropriate. Does that answer your question? Yeah, I understand your argument. Thank you. Pardon? I understand your argument. Okay. Thank you. Some of the other things that I guess some other statistics that are important in this particular case is that 78% of these riggers performed non-rigger jobs. So once they perform, they finish their rigger jobs and they want to work the concert, they then move to another job. And just think of the difficulty it would be for an employer to administer that kind of situation of where you have a bargaining unit employee, he finishes his job, he then goes to a completely different job on the very same event, the same concert, the same corporate event, is not part of the bargaining unit. And then at the end of the show, he then goes back into the bargaining unit. I can't think of any situation in my 34 years of practice where that has worked. I mean, you gave the example of the construction industry, for example, the trades, where trades are typically union and they typically have jurisdictional lines. But you don't have situations in the construction industry typically where they go from a union job to a non-union job back to a union job on the same premise or the same project. That's just, I mean, it's something that is just not workable in the real world. When riggers do crew work, are they doing it on a voluntary basis? It's interesting, this type of work is everybody volunteers to sign up for work. So in other words, you hire me to do rigger work. And that's what I do. And if I feel good, I'll do some And there's nothing you can do about it because you hired me as a rigger. No, that's absolutely true. That's my point. I mean, it's just a voluntary thing. It is voluntary, but for example, the board uses the Red Lobster case as an example of voluntary. And in that particular case, it was the employees had an eight-hour shift. But what they did is they moved, it was the choice between one store and another, but they've still had their eight-hour shift. And in this particular case, it's different because it's the riggers who decide whether they want to work for my client, Rhino, or they want to work for another client, particularly in a large metropolitan area where you have multiple shows going on at one time, because they have a choice of who they voluntarily work for and then how long they want to work on any particular show. Does that make... Some of the other issues I would like to point out is some of the factual misstatements that the board made. One of the important factors that this court has relied on as well as specialty healthcare is supervisors, who supervises the employees. And in the decision and direction of election by the regional director, they state, the regional director stated, the record reveals that all the employees, employers' employees, at each call except the riggers, take direction from a show supervisor and crew chief. The riggers, in contrast, take direction from their own rigger supervisor. The record evidence in this case was just the opposite of that. The director of operations testified in response to a question to the hearing officer. How frequently would you say that Taylor, and Taylor Alexander was a rigging manager, supervises non-riggers? She says, it's a team effort. So he's always out in the job site, watching and making sure the employees are doing what they're supposed to be doing. All employees, not just riggers. One specific that I can remember is Chambers Bay, when they were doing a preview of the tents, and he worked as a supervisor over all of the employees. She went on to say that the two show supervisors, Eric Durda and Dan Skolnick, are supervisors over all the employees, not just the stagehands. And the disputed testimony also says Mr. Alexander is responsible for all employees' safety when he's on the job. He's the safety person that watches over everyone. So again, if you go back, and again, this requires a reading of the entire record. And when you read the entire record, you'll find that there's a number of misquotes of the record. And there's another issue had to do with integration. Obviously, integration of the employees is one of the key factors under Blue Man Vegas. And in the board's brief at page nine, they say lighting helps build the trust. But what they failed to talk about, and they also helped put on cable. So when these employees build the trust, the board would have us believe that the riggers come in, do their thing, nobody else is around them, and then everybody else comes in and everything magically gets done. That's not the way it works. You are in a very confined space, probably the length of this courtroom, working on a trust where they're working jointly to put lights on, they're putting speakers on, and then when everything is ready to go and the board focuses, for some reason, on motors, they think that's the one thing to distinguish riggers from everybody else, is that when the trust is ready, then they take the trust and they bring it up. But it's a joint effort by stagehands to bring the motor to the stage, to unload the motors, to help attach the motors, to run cables to the motors. So it's truly a team effort. And even the board said in its brief is that they worked together, but independently. So again, going back to your comment of the football, Judge Edwards, it is. Every position on the football team works independently. But in order to be successful, they have to work as a team. And that's really what our evidence showed in this particular case, is a true... Did you argue anything about credibility in your brief? Yes, we did. I don't think the word's in there. Well, we talked about, I believe we talked about, the union relied on one witness. His name was Matt Clemesch, who only worked 115 hours over a two-year period. No, no, no. I'm asking, did you raise the argument? I believe we did. I can't tell you the... I can't find it. Okay. Or it's in the reply. Well, that's late. I'm... Pardon? That's too late. Well... I mean, I'm listening to you. I couldn't... I was perplexed. I don't remember any credibility argument being raised in your opening brief. I can't point to the particular record. But we're talking about an individual that testified that was a competitor that I believe we did mention. But I'll have to check. And again, on its face, when you have a competitor testifying against this employer, I think that testimony on its face cannot be credible. And it doesn't work very well. You're raising a different point. You're talking about the standards of review, which you referred to. I understand. You didn't raise this claim that there was a dispute on who supervised who, and there was a credibility finding to be made that it wasn't properly made. I can't find that argument in your... I think we did. We certainly laid out the difference. And as I just quoted to you, we laid out those in our brief, clearly, where the decision and direction of election said... The question is whether you've raised an issue on appeal and said you can't credit the board's determination. I understand. Why don't we hear from the board? I'll let you come back. Okay. Good morning. Thank you. May it please the court, I'm Greg Lauro for the National Labor Relations Board. Asking this court to enforce the board's order because it's finding that the rigor unit constituted inappropriate unit is supported by substantial evidence and consistent with applicable law. And my opponent acknowledges that they face a heavy burden in showing that this is an even inappropriate unit because of an overwhelming community of interest between the included and excluded employees. And in the board's view, their attempts to meet that burden fails for two reasons. One, is there is substantial evidence showing significant distinction between the rigors and the non-rigors, some of which were discussed this morning, that they do have some distinct job function and some separation and supervision. Widely divergent pay, and as was noted, they have special training such that the non-rigors cannot volunteer to do rigging work. And when you look at the widely divergent pay that rigors make $21 to $40 an hour and the non-rigors make on average $11 to $20, and often on the lower end of that range, I think it speaks to how the employer itself recognizes the training and abilities of rigors and paying them so much more. And while my opponent may have a different view of the record, substantial evidence supports the board's finding. And while my opponent may be able to show, well, perhaps this other unit we want is also an inappropriate unit, that you could construct an inappropriate unit that way, that doesn't meet their burden of showing that this unit is truly inappropriate. And with that in mind, I invite any other questions for the court, but I think the board's finding that this is an inappropriate unit. It is well-supported and consistent with a point of precedent. So you're agreeing with them they can never meet their burden of the discussion? Not at all. Not at all. In fact, courts of appeals, in approving the specialty standard that we cite in our brief, I believe it's page 51 and also 49, have already rejected this argument that the specialty health care standard in the second prong of overwhelming community of interest is unachievable. That argument has been rejected, and in fact the board has found that the overwhelming community of interest standard has been met both before and after the implementation of specialty health care. And the thrust of your argument is interesting. You're saying correctly that the law will approve a unit if it is appropriate. It doesn't have to be perfect. Yes, Your Honor. But if you follow that all the way through, if the first test, the first part of the test is met, then there's no question that there is a unit that is appropriate. So the second part of the test essentially becomes irrelevant. Otherwise, the argument, the way you're arguing today, you're saying, look, all you have to do Well, Your Honor, that makes the test look pretty absurd, because if you meet the first part of the test, you're essentially saying you're done. There is no second part. Not at all, Your Honor. And I apologize if I misspoke or said something confusing, but when I'm asked how does the board determine whether there is an appropriate unit, I'm speaking of the whole two-part specialty health care framework. Yes, it's true. If the board applies the traditional community of interest factors, the ones sanctioned by this court and Blue Man Vegas and every other court to address the issue, to assess is this an appropriate unit. And if the answer is yes and someone challenges it, that party has a chance to prove it's their burden that there's such an overwhelming community of interest between the excluded and the included employees that you can't even have an appropriate unit without adding them. And I'm just saying they failed to meet that burden here. It wasn't even a cross-cut. I apologize if I was confusing it. I'm just saying courts I take it your view is that just because a group of employees has a community of interest thereby satisfying the first prong of the test, that doesn't mean it's an appropriate unit. Because it might still be an inappropriate unit if there were no sound basis for excluding other employees. Your Honor is correct. As this court said in Blue Man Vegas, there are multiple potential appropriate units and the fact you can point to another one doesn't mean that the unit that the board had here that is an appropriate unit is suddenly inappropriate. And I think my opponent sometimes forgets. But I think what we're asking about is the Congress situation, which is that just because there's a community of interest among a group of employees doesn't mean that that's an appropriate unit. Do you disagree with that? I don't think I disagree with that. I want to make sure I understand what you're saying. I acknowledge that the fact that you find an inappropriate unit at the first step isn't the end of analysis if a party No, it's not a community of interest at the first step. Well, the community of interest is the test, which this court has also approved for determining whether it's an appropriate unit at the first step. No, I understand that. No, I apologize. I want to answer your question. I'm sorry if I misunderstood. But something I do want to say is, I recognize my opponent paints a nice picture that was discussed this morning about teamwork and working together, and I'm sure that's true. There's some functional integration at a high level, but they paint with too broad a brush, and they obscure the distinctions the board reasonably relied on here, supported by the record, defined that the rigors-only unit was an appropriate unit. And we've discussed the differences, and some of them are stark, whether it's widely divergent wages or the fact that the rigors training is so different and specialized enough so that non-rigors can't afford leaving work. These kind of factors and all the others that were discussed, some evidence of separate supervision, et cetera, do support finding that the separate unit is appropriate and that the burden of showing an overwhelming community of interest, that you had an almost total overlap, to use this court's words at Blue Man Vegas, that that standard isn't met. And as you know from our brief, we're talking about a test here, a specialty health care that was an overwhelming community of interest test, I should say, that has been approved by this court previously at Blue Man Vegas, adopted by this court as specialty health care, and then approved by every circuit to address the issue, and they're in ours now. Thank you. Why don't we hear from the interviewer? Thank you, Your Honor. Good morning, Your Honor. May it please the court, my name is Dimitri Glipson, representing Local 15 of the International Alliance of Theatrical Stage Employees. I want to talk to you today about two things. First, the record below actually establishes that the job involved here is actually much less integrated and much less of a team than the football team. And in fact, at least in Seattle with the Seahawks, we like to think of the Seahawks as being much more egalitarian than the stagehands and riggers workplace. At the right of workplace, and the record amply supports these conclusions, and frankly almost all of the issues raised below were undisputed. The only thing actually disputed was whether Mr. Alexander supervised only the riggers most of the time, and there was plenty of evidence to support the regent's conclusion that he does. But it's a highly stratified workplace with stagehands at the bottom and riggers at the top, literally at the top, up in the ropes, in the rigging, using shackles, steel cables, motors, chains, and pulleys to hang equipment. It is dangerous work compared to the work of the stagehands. Heidi Gonzalez, one of the riggers who testified, pages 401 in the transcript, talked about the many risks riggers face, a risk of falling, a risk of dropping something, a risk of hanging something improperly, and a risk of personal liability if they make a mistake at their job, which they are all told in training that if somebody gets hurt because of their work as a rigger, they personally can get sued. As a result of the risks and specialized skills involved in doing the rigging, they have to have significant specialized training, fall protection, rigging training, they have their own certification. They are doing work that stagehands are categorically not allowed to do, and Rhino's CEO testified to that at page 128 in the transcript. Only riggers are allowed to touch the equipment. Only riggers are allowed to do the rigging. And because of the nature of this work, riggers are hired from a specialized workforce. They are not hired off the street. There are highly qualified, trained riggers that come in and do this work. As a result of all of these differences, the riggers, as we've seen, and it's not disputed, are highly compensated, more perhaps even than a quarterback is over a very good offensive tackle. The riggers getting between $21, $40 an hour. Stagehands, we heard $11 to $20, but the employer's witness testified the vast majority of stagehands are getting much closer to $11 an hour than $20. So that's riggers at the top. At the bottom, by contrast, the stagehands performing unskilled labor with no experience required. It's manual labor and unsurprisingly paid minimum wage or very low wages. So if the question is, as it is, did the board rule correctly that the employer did not meet its burden of establishing an overwhelming community of interest between the stagehands and the riggers, such that there is no legitimate basis to exclude stagehands from a union of riggers, the answer is absolutely. Reiner's attorney suggests at a more philosophical level that the problem with the specialized health care rule is that if the first test is met, that there is a community of interest among riggers, then the second test is always met, that there is not an overwhelming community of interest. That is simply not true. Even in specialty health care, the court cited to the Wheeling Gaming case, which found that while poker dealers shared a community of interest amongst themselves, the other employees at the casino shared such an overwhelming community of interest with them that the unit was not appropriate. And immediately after specialized health care, you had the Adwala case that held that it was improper to exclude merchandisers from a group of other employees, even though those employees had a community of interest. In fact, on page 31 of the employer's brief, he cites three board decisions holding that all the first test was met, the community of interest among the petitioned for unit, the second test, the employer met its burden. And it's also a philosophical error, a practical error, because last night on a LARC, I found six different regional director decisions finding that a petitioned for unit met the first test, that there was a community of interest on the second test, and the petitioned for unit was therefore not appropriate. But what happens when a union petitions for a unit, and the region says, that's not the proper unit, these other workers have to be included, either the union goes forward with an election with the larger unit, or they give up. It's very rare for practical economic reasons that those cases go up in appeal. So it's simply not a basis to critique the illusory. The thing I want to leave you with is that there's a suggestion that, as in the NLRB versus Tito decision, that the board simply rubber-stamped a regional director decision, and the regional director simply rubber-stamped the petition. That is not true. I've identified the many factors that indicate that riggers do have their own strong, separate identity, community of interest, wages, training, danger, and so forth. But the regional director also addressed the arguments that tend to cut the other direction. There are serious arguments that were raised below about functional integration and interchange. With functional integration, however, the regional director applied well-established board law that the fact that you're all working together as a team is not functional integration, such as to create an overwhelming community of interest if you're each doing your own role, which riggers clearly are. With interchange, the point is you get hired, as Judge Rogers was indicating. You get hired as a rigger. You work as a rigger. In fact, you get hired as a rigger for a four-hour shift. The record is undisputed. If you finish your rigging in two and a half or three hours, you can go home with full pay, something that never happens to a statesman. There are times, because rigging is intermittent work, if there's not enough work as a rigger to pay your bills, then a rigger would volunteer to work a shift as a stagehand. But following well-established board law, we find that voluntary, one-way assumption of work of one type, in this case stagehand work, by riggers, where stagehands can never work as riggers and riggers are never forced to work as stagehands, doesn't meet the board standard of the kind of interchange that would weigh heavily in favor of a finding of an overwhelming community of interest. So the important thing is that the regional director evaluated all of the evidence and all of the legal arguments both in favor and against the existence of an overwhelming community of interest. The board affirmed the regional director's decision. It's well-established, well-supported by the evidence. So we don't have a situation where somehow no reasoned decision was made below and therefore the cases indicated as appropriate should be given to the board's decision affirming the regional director's conclusions, which were not credibility-based conclusions but based on really the undisputed evidence before the regional director. Thank you. Are there any questions? Thank you. All right. Thank you all. All right. Counsel for petition. Thank you. In Sundor Brands, which this court decided in 1999, stated that if any one of the six community of interest factors relied on by the regional director is unsupported by evidence in the record, the board must reconsider the unit determination. And then in Tenneco, also in Tito case, the obligation of the reviewing court is to assess the whole record, meaning our analysis must consider not only evidence supporting the board's decision but also whatever in the record fairly detracts from its weight. And that's what the regional director failed to do in this case. He did not consider a significant part of the employer's evidence in determining the eight factors of community of interest. Both counsel for the union as well as counsel for the general counsel talked about wages. In Blue Man Vegas, the standard that this court set out was the method of wages. In that case, it had to do with musical technicians or MITs. It specifically talked about stage So again, in our particular case, yes, there is a wage difference, like there is under many, many, if not all collective bargaining agreements, there is a wage differential. But that's not the test under Blue Man Vegas. It is the method of payment. The hours of work, counsel for the union said, everybody has a four-hour call. Yes, some can leave early if they're done, but they all get paid the same. They all get paid their four hours. The benefits are absolutely identical, and the regional director never addressed that issue. Supervision, we talked about already and gave you some examples where, in fact, the regional director did not even correctly quote the record. We are conceding, obviously, the training skills are different between the riggers and the stagehands. But remember, some of those stagehands include high-row people who also have to get up in the rafters, also have to have fall protection, also have to have special skills. So it's not just people who are moving boxes that we're talking about. We're talking about electricians that are part of the stagehand group. We're talking about forklift drivers that require certification. We're not just talking about laborers here. We're talking about everybody else that puts on a concert other than the riggers. As far as the contact with employees, you're in a very small area in which they're trying to get a show put on, and there is constant contact with these employees that cannot be separate. It's not like a factory or like in the FedEx case where you have the warehouse people and the drivers where there might be a very small interchange. They are all working in tandem together to put the show on on time. And, of course, we talked about functional integration. Seventy-eight percent of the riggers perform non-rigger work. And then we talked about the industry standard, again, which neither counsel addressed in this particular case. I know it's not dispositive, but certainly one of those eight factors that this court is relying on. So with that in mind, I would ask this court at a minimum to remand this case to the regional director and follow the directions of this court, and that is consider the entire record before making his decision as to what the appropriate unit is, as well as determining whether or not the employer met the overwhelming standard that's set out in specialty health care, as well as Blue Man Vegas. Thank you. Thank you very much. We'll take the case under advice.
judges: Rogers, Srinivasan, Edwards